UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WASHINGTON CITIES INSURANCE AUTHORITY, | NO. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| IRONSHORE INDEMNITY, INC. | **JURY DEMAND** |
| Defendant. | |

## I. PARTIES

1.1    Plaintiff Washington Cities Insurance Authority ("WCIA") is an association of Washington public entities organized under and authorized by RCW 48.62 for the purpose of jointly self-insuring risks, jointly purchasing insurance or reinsurance, and contracting for joint risk management, claims and administrative services.  WCIA has satisfied all statutory and other prerequisites to maintain this action.

1.2    Defendant Ironshore Indemnity, Inc. ("Ironshore") is a corporation organized under the laws of the State of Minnesota, and a foreign, authorized insurer in the State of Washington.

## II. JURISDICTION & VENUE

2.1    The amount in controversy in the present case exceeds $75,000.00.

COMPLAINT - 1

Law Offices of
**HACKETT BEECHER & HART**
601 Union Street, Suite 2600
Seattle, Washington 98101-4000
(206) 624-2200

2.2     There is complete diversity in citizenship between the Plaintiff and the Defendant.

2.3     This case is therefore a civil action for which this Court has original jurisdiction pursuant to 28 U.S.C. §1332(a)(1) and (c)(1).

2.4     Venue is proper in the Western District of Washington pursuant to 28 U.S.C. §128, as the WCIA has its principal place of business in Tukwila, King County, Washington.

### III. FACTS

3.1     The WCIA is an association of Washington public entities organized under and authorized by RCW 48.62 for the purpose of jointly self-insuring risks, jointly purchasing insurance or reinsurance, and contracting for joint risk management, claims and administrative services for the benefit of itself and its member cities.  At all relevant times, both the City of Lakewood and the City of Fife were members of the WCIA and entitled to all benefits and rights of membership.

3.2     Some of the benefits provided to member cities by the WCIA are provided by the terms of the WCIA's Self-Insured Coverage Document, and the WCIA's Joint Liability Protection Program. These documents define contractual rights and duties of member cities and include an obligation on the part of the WCIA to provide a defense and indemnification to certain liability claims against member cities, and to certain employees of member cities.

3.3     The WCIA also procured policies of reinsurance applicable to losses that exceeded the WCIA's self-insured layer limit of $4 million.  The first level of reinsurance was supplied by GEM and had a "per occurrence" limit of $1 million.  The second layer of reinsurance was supplied by Ironshore and has "per occurrence" limits of $10 million.  A true and correct copy of the Ironshore Casualty Excess of Loss Reinsurance Agreement is attached as Exhibit A hereto (the "Ironshore Insurance Agreement").

COMPLAINT - 2

3.4     The claim in this case originates from underlying litigation that took place in this Court, under the consolidated Case Nos. 3:15-05346-BJR and 3:16-cv-05392.  The Complaints in those consolidated actions are incorporated herein by reference, and the summary below is not intended to be exhaustive.

3.5     The consolidated Complaints in those cases alleged causes of action on behalf of Fredrick Thomas and Annalesa Thomas, the Estate of Leonard Thomas, and Leonard Thomas's son, E.T.

3.6     The Complaints generally state causes of action for police misconduct and excessive use of force during a police response to an incident that took place in May 2013.

3.7     The plaintiffs alleged Analessa Thomas received a call from her son, Leonard Thomas, in which Leonard expressed that he was upset because of the recent death of a friend, and asked Analessa to pick up Leonard's four-year-old son (Analessa's grandson) E.T.  Leonard and E.T. were at their house, which was owned by Analessa Thomas and her husband (Leonard's father), Fredrick Thomas.

3.8     When Analessa arrived at the house, Leonard was outside with Kimberly Thomas, who was Leonard's wife, from whom he had separated, and E.T.'s mother.  Analessa attempted to remove E.T. from Leonard to take him home with her for the night, but Leonard understood this to be an attempt to remove E.T. from his custody and grew reluctant and upset.

3.9     Analessa called 911.  The Fife police arrived, and the situation escalated.  Leonard refused to come out or release E.T.  The Fife police called in the Metro SWAT team, which included officers from the City of Lakewood.

3.10    The situation continued to escalate, and eventually the SWAT team determined to rescue E.T. through the use of force.  Ultimately, SWAT sniper Brian Markert of the Lakewood Police department shot and killed Leonard, while Leonard was holding E.T. in his arms.

COMPLAINT - 3

3.11    SWAT Officer Nath Vance and Team Leader Wiley came through the front yard and shot and killed Leonard's dog.

3.12    The plaintiffs asserted causes of action under 42 U.S.C. § 1983 and the Fourth Amendment to the Constitution for violation of their civil rights, as well as State law claims for outrage, negligence, and false arrest.

3.13    The case was tried to a jury, which returned the verdict attached hereto as Exhibit B.

3.14    The Court entered an amended Judgment on the verdict, attached hereto as Exhibit C.

3.15    The Defendants in that litigation appealed the Judgment to the Ninth Circuit Court of Appeals.

3.16    While that appeal was pending, the case settled.  The Defendants agreed to pay, collectively, $12.5 million to the Plaintiffs.  The parties agreed that of this amount, $11.5 million would represent compensatory damages, and $1 million would represent punitive damages.

3.17    The punitive damages component was paid exclusively by the City of Lakewood.

3.18    Throughout this underlying litigation, the WCIA provided a defense to all Defendants, at its sole expense.

3.19    The WCIA and its first layer of reinsurance, GEM, funded the $11.5 million payment to the Plaintiffs.

3.20    There are more than $8 million in total loss costs above the combined $4 million self-insured layer limit of the WCIA and the $1 million limit of the GEM policy.  This amount falls within the Ironshore layer of reinsurance, per the terms of the Ironshore Insurance Agreement.

3.21    The WCIA provided Ironshore notice of the Thomas litigation at the inception of the claim, per the notice requirements in the Ironshore Insurance Agreement.

3.22    The WCIA provided Ironshore notice of developments in the defense of the Thomas litigation, including notice of mediations.

COMPLAINT - 4

3.23    The Thomas jury reached its verdict on July 14, 2017.

3.24    Ironshore issued letters to the WCIA purporting to reserve its rights under the Ironshore Insurance Agreement on July 31, 2017 and August 17, 2018, but did not deny the claim until after the WCIA, GEM and the City of Lakewood had fully funded the settlement with the Thomas plaintiffs.

3.25    Despite proper notice of the claim, at no time prior to the verdict did Ironshore either inform the WCIA of a reservation of rights or deny the claim.

3.26    Based on Ironshore's knowledge of the claim and apparent acceptance of it under the terms of the Ironshore Insurance Agreement, the WCIA made certain decisions regarding pre-verdict settlement in reliance on Ironshore's failure to reserve rights to deny coverage.

3.27    An Ironshore representative attended mediations of the Thomas litigation, and an attorney for Ironshore appeared to monitor the Thomas litigation, ostensibly on behalf of the Thomas defendants.  At no time prior to the verdict did Ironshore suggest any basis for a failure of coverage under the Ironshore Insurance Agreement.

3.28    By letter of December 13, 2018, the WCIA informed Ironshore of the total incurred liability, providing documentation to support the request.

3.29    By letter of December 19, 2018, Ironshore rejected the WCIA's request for reimbursement.

### IV. FIRST CAUSE OF ACTION – DECLARATION OF RIGHTS

4.1    RCW 48.18.200 provides, in pertinent part:

> (1) No insurance contract delivered or issued for delivery in this state and covering subjects located, resident, or to be performed in this state, shall contain any condition, stipulation, or agreement

COMPLAINT - 5

(a) requiring it to be construed according to the laws of any other state or country except as necessary to meet the requirements of the motor vehicle financial responsibility laws of such other state or country; or
(b) depriving the courts of this state of the jurisdiction of action against the insurer . . . .

(2) Any such condition, stipulation, or agreement in violation of this section shall be void, but such voiding shall not affect the validity of the other provisions of the contract.

4.2     The Ironshore Insurance Agreement in this case contains a putative provision specifying, in relevant part: "Any and all disputes or difference arising out of this Agreement, including its formation and validity, shall be submitted to binding arbitration."

4.3     The Ironshore Insurance Agreement in this case contains a putative provision specifying, in relevant part: "The arbitration shall take place in New York, New York."

4.4     The Ironshore Insurance Agreement in this case contains a putative provision specifying, in relevant part: "Unless prohibited by law, the Supreme Court of the State and county of New York and of the United States District Court for the Southern District of New York shall have exclusive jurisdiction over any and all court proceedings that either party may initiate in connection with the arbitration, including proceedings to compel, stay, or enjoin arbitration or to confirm, vacate, modify or correct an Arbitration Award."

4.5     The Ironshore Insurance Agreement in this case contains a putative provision specifying, in relevant part: "This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of law principles."

4.6     The putative provisions described in paragraphs 4.1-4.6 are violative of RCW 48.18.200, and are void ab-initio.

4.7     The validity of the provisions described in paragraphs 4.1-4.6 are an actual case or controversy between the Parties, and thus the proper subject of a declaratory judgment under 28 U.S.C. § 2201.

COMPLAINT - 6

## V. SECOND CAUSE OF ACTION – BREACH OF INSURANCE CONTRACT

5.1    With the exception of the claim for punitive damages, the claims in the Thomas litigation against the City defendants, and the employees of City Defendants, were covered under the terms of the Self-Insured Coverage Document issued by the WCIA.

5.2    With the exception of the claim for punitive damages, the claims in the Thomas litigation against the City defendants, and the employees of City Defendants, were covered under the terms of the Ironshore Insurance Agreement.

5.3    Pursuant to the terms of the Ironshore Insurance Agreement, Ironshore was required to reimburse the WCIA in the approximate amount of $8.9 million.

5.4    Despite proper notice and demand, Ironshore has denied its obligation and refused to so reimburse the WCIA.

5.5    Ironshore's refusal is a breach of the Ironshore Insurance Agreement.

5.6    The WCIA was damaged by this breach in an amount to be proven at trial, but at least $8.9 million.

## VI. THIRD CAUSE OF ACTION – ESTOPPEL COUNT ONE

6.1    In connection with issuing the Ironshore Insurance Agreement, Ironshore demanded and received a full loss run of all claims handled by the WCIA in the previous ten years and any questions submitted by Ironshore's underwriter were answered to Ironshore's satisfaction.

6.2    The loss run that WCIA produced and Ironshore inspected, included documentation from several claims where the WCIA had provided coverage under the terms of the Self-Insured Coverage Document for claims against Cities and employees of Cities alleging that police use of excessive force had violated the plaintiffs' Constitutional rights.

6.3    As a result of its review of the loss run, Ironshore was fully apprised and aware that the WCIA considered such claims to be covered claims under the terms of the Self-Insured Coverage Document.

COMPLAINT - 7

Law Offices of
**HACKETT BEECHER & HART**
601 Union Street, Suite 2600
Seattle, Washington 98101-4000
(206) 624-2200

6.4     At no time between when Ironshore issued the Ironshore Insurance Agreement and its first reservation of rights in this case in July 2017, did Ironshore question or reserve any rights with respect to the WCIA's position that allegations of police use of excess force were covered under the Self-Insured Coverage Document.

6.5     Prior to the issuance of the Ironshore Insurance Agreement, Ironshore represented to the WCIA that it was satisfied with WCIA's handling of claims made by member Cities and the employees of member Cities.

6.6     The WCIA relied upon Ironshore's approval of its claims handling practices, as they actually existed, in ultimately deciding to purchase the Ironshore Insurance Agreement.  This was important because the Ironshore Insurance Agreement purports to exclude coverage for losses not covered by the Self-Insured Coverage Document.

6.7     If Ironshore had alerted the WCIA to its position that allegations of police use of excessive force were not covered by the Self-Insured Coverage Document, and thus were allegedly outside the coverage of the Ironshore Insurance Agreement, the WCIA would not have purchased the Ironshore Insurance Agreement.

6.8     A primary basis for which Ironshore denied the WCIA's claim in the Thomas matter was that allegations of police use of excessive force were not covered by the Self-Insured Coverage Document.

6.9     The WCIA has reasonably relied to its detriment on Ironshore's position to the contrary, and on that basis, purchased the Ironshore Insurance Agreement.

6.10    Ironshore's representation, after its review of the WCIA's loss run, that the WCIA's claims handling was being conducted appropriately within the scope of the Self-Insured Coverage Document was intended to induce the WCIA's reliance.

Law Offices of
**HACKETT BEECHER & HART**
601 Union Street, Suite 2600
Seattle, Washington 98101-4000
(206) 624-2200

6.11    Based on these facts, Ironshore should be equitably estopped from asserting that allegations and liability related to police use of excessive force are outside the coverage of either the Self-Insured Coverage Document or the Ironshore Insurance Agreement.

### VII. FOURTH CAUSE OF ACTION – ESTOPPEL COUNT TWO

7.1    The WCIA provided Ironshore notice of the Thomas claim at the inception of that litigation.

7.2    Despite having full access to all allegations and defenses in the Thomas litigation, Ironshore was silent with respect to its position on coverage until after the jury verdict.

7.3    Ironshore's silence during the course of the Thomas litigation with respect to its *post hoc* determination of no coverage was reasonably understood by the WCIA to represent that Ironshore's consented to the WCIA's position on coverage under the terms of the Self-Insured Coverage Document.

7.4    During the course of pre-trial negotiations in the Thomas litigation, the WCIA reasonably relied to its detriment on Ironshore's acquiescence in the WCIA's coverage position and made offers of settlement commensurate with the WCIA's understanding that a verdict that fell, value-wise, in the Ironshore layer of reinsurance would be covered by Ironshore.

7.5    If Ironshore had properly apprised the WCIA of its coverage position early in the course of the claim, the WCIA could have funded a settlement of the matter which would have reduced the WCIA's incurred liability.

7.6    Based on these facts, Ironshore should be equitably estopped from asserted coverage defenses after the jury's verdict and the Court's judgment.

### VII. PRAYER FOR RELIEF

WHEREFORE, having stated the foregoing causes of action against Ironshore, the WCIA respectfully requests the Court grant it the following relief.

A.   A money judgment for breach of contract;

COMPLAINT - 9

Law Offices of
**HACKETT BEECHER & HART**
601 Union Street, Suite 2600
Seattle, Washington 98101-4000
(206) 624-2200

B. A determination that Ironshore is equitably estopped from asserting policy defenses to coverage;

C. A determination that the arbitration provision in the Ironshore Insurance Agreement is void;

D. A determination that the choice of law and venue provisions in the Ironshore Insurance Agreement are void;

E. For an award of attorney fees and costs under *Olympic Steamship*.

F. For pre- and post-judgment interest; and

G. For all such and further relief as to the Court may seem just and equitable.

DATED this 11th day of January 2019.

By: s/Brent W. Beecher
Brent W. Beecher, WSBA #31095
By: s/J. William Ashbaugh
J. William Ashbaugh, WSBA #21692
HACKETT, BEECHER & HART
601 Union Street, Suite 2600
Seattle, WA  98101
Telephone: (206) 787-1830
Email: bbeecher@hackettbeecher.com
        washbaugh@hackettbeecher.com

By: s/Franklin D. Cordell
Franklin D. Cordell, WSBA # 26392
By: s/J. Miles C. Bludorn
Miles C. Bludorn, WSBA # 54238
GORDON TILDEN THOMAS & CORDELL, LLP
600 Union St., Suite 2915
Seattle, WA   98101
Telephone (206) 467-6477
Email: fcordell@gordontilden.com
        mbludorn@gordontilden.com

Attorneys for Plaintiff

COMPLAINT - 10

# Exhibit A



Depth in Leadership. Trusted Partnership.

# IRONSHORE
*your safe harbour*

## IRONSHORE INDEMNITY, INC.

(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY 10008
(877) IRON411

### CASUALTY EXCESS OF LOSS
### REINSURANCE AGREEMENT

**between**

**WASHINGTON CITIES INSURANCE AUTHORITY**

**and**

**IRONSHORE INDEMNITY, INC.**

**REINSURANCE AGREEMENT # 000861003**

## TABLE OF CONTENTS

DECLARATIONS                                                        1


ARTICLE

I        BUSINESS REINSURED                                         1

II       TERRITORY                                                  1

III      RETENTION AND LIMIT                                        2

IV       COVERAGE FORMS                                             2

V        UNDERWRITING GUIDELINES                                    2

VI       UNDERWRITING / CLAIMS ADMINISTRATION                       3

VII      EXCLUSIONS                                                 3

VIII     DEFINITION OF OCCURRENCE                                   5

IX       ULTIMATE NET LOSS                                          6

X        CLAIMS                                                     6

XI       SUBROGATION AND SALVAGE                                    7

XII      ACCESS TO RECORDS                                          7

XIII     TAXES                                                      7

XIV      INSOLVENCY                                                 8

XV       OFFSET                                                     8

XVI      PREMIUM, REPORTS AND REMITTANCES                           8

XVII     NON-ASSIGNMENT / THIRD PARTY RIGHTS                        9

XVIII    ARBITRATION                                                9

XIX      ENTIRE AGREEMENT                                          10

XX       INTERMEDIARY                                              10

XXI      COMMENCEMENT AND TERMINATION                             10

XXII     SEVERABILITY                                             11

XXIII    GOVERNING LAW                                            11

XXIV     CONFIDENTIALITY                                          11

XXV      NOTICES                                                  11

## CASUALTY EXCESS OF LOSS
## REINSURANCE AGREEMENT

**DECLARATIONS**

This Agreement made and entered into by and between WASHINGTON CITIES INSURANCE AUTHORITY, 320 Andover Park East, Tukwila, Washington 98188 (hereinafter referred to as the "Company") and IRONSHORE INDEMNITY INC., PO Box 3407, New York, NY 10008. (877) IRON-411 (hereinafter referred to as the "Reinsurer").

**WITNESSETH:**

The Reinsurer hereby reinsures the Company to the extent and on the terms and conditions and subject to the exceptions, exclusions and limitations hereinafter set forth and nothing hereinafter shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third parties or any persons not parties to this Agreement.

## ARTICLE I

**BUSINESS REINSURED**

The Reinsurer agrees to indemnify the Company, on an excess of loss basis, for Ultimate Net Loss paid by the Company as a result of losses occurring under the Company's Coverage Forms underwritten by the Company and covered by this Agreement. Such business classified by the Company as Casualty Business, including the Lines of Business listed below, subject to the terms and conditions set forth in this Agreement.

> General Liability
> Products Liability
> Law Enforcement Liability
> Stop Gap Liability
> Public Officials Liability
> Employee Benefit Liability
> Automobile Liability
> Employment Practices Liability

## ARTICLE II

**TERRITORY**

A. This Agreement applies only to Coverage Forms issued to Members domiciled in the State of Washington; and shall follow the territorial limits of the Coverage Forms reinsured hereunder.

B. The term "Member" shall mean each insured provided coverage under the Company's Coverage Form and reinsured under this Agreement.

1

## ARTICLE III

**RETENTION AND LIMIT**

The Reinsurer shall be liable for that amount of Ultimate Net Loss each Loss Occurrence in excess of the Company's retention of $5,000,000 Ultimate Net Loss each Loss Occurrence.  However, the Reinsurer's liability shall never exceed $10,000,000 Ultimate Net Loss each Loss Occurrence, subject further to an aggregate limit of $10,000,000 Ultimate Net Loss per Member during the term of this Agreement as respects each of the following lines of business individually regardless of the number of Loss Occurrences involved:

- Products Liability
- Public Officials Liability
- Employment Practices Liability
- Employee Benefits Liability

**As respects Law Enforcement Liability the following per member aggregate shall apply:**

The Reinsurer's liability shall be subject further to an aggregate limit of $20,000,000 Ultimate Net Loss per Member during the term of this Agreement regardless of the number of Loss Occurrences involved and shall apply only to jail related losses and only to members that have jail facilities that are greater than overnight temporary facilities.

## ARTICLE IV

**COVERAGE FORMS**

A. The Company and the Reinsurer have mutually agreed on the Company's Coverage Forms and endorsements as respects the business reinsured hereunder and it is understood and agreed that the Company shall advise the Reinsurer in writing of any material changes in such Coverage Forms no later than 30 days prior to the implementation of any change.

B. The term "material changes" as used in this Agreement means any deviation that increases the Reinsurer's liability under this Agreement.

C. The terms and conditions of this Agreement shall take precedence over any other agreement between Company and the Reinsurer regarding the reinsured Coverage Forms.

## ARTICLE V

**UNDERWRITING GUIDELINES**

A. The Company and the Reinsurer have mutually agreed to the Company's underwriting guidelines as respects the business reinsured hereunder, and it is understood and agreed by the parties hereto that any material changes to these guidelines shall be approved in writing by the Reinsurer prior to the implementation of any such changes.

B. The terms of paragraph A shall take precedence over any other agreement between the Company and the Reinsurer regarding such underwriting guidelines.

## ARTICLE VI

**UNDERWRITING / CLAIMS ADMINISTRATION**

A. The Company and the Reinsurer have mutually agreed to the Company as Underwriting Administrators and Claims Administrators hereunder, and it is understood and agreed that any material changes in the Underwriting or Claims Administration shall be approved in writing by the Reinsurer prior to the implementation of any such changes.

B. The terms of paragraph A above shall take precedence over any other agreement between the Company and the Reinsurer regarding such Underwriting Administration and Claims Administration.

## ARTICLE VII

**EXCLUSIONS**

A. The reinsurance provided under this Agreement is subject to the exclusions set forth below. Any exception to these exclusions shall be submitted by the Company to the Reinsurer for inclusion hereunder, and if specifically accepted in writing by the Reinsurer, shall then be covered under the terms of this Agreement, except to the extent the terms of this Agreement are modified by the special acceptance.

B. The reinsurance provided under this Agreement shall not apply to the following:

1. Business ceded from any Pool (except the public entity pool reinsured hereunder), Association (including Joint Underwriting Associations), Syndicate, Exchange, Plan, Fund or other facility directly as a member, subscriber or participant, or indirectly by way of reinsurance or assessments.

2. Liability of the Company arising from its participation or membership, whether voluntary or involuntary, in any insolvency fund, including any guarantee fund, association, pool, plan or other facility which provides for the assessment of, payment by, or assumption by the Pool of a part or the whole of any claim, debt, charge, fee or other obligations of an insurer, or its successors or assigns, which have been declared insolvent by any authority having jurisdiction.

3. Liability excluded by the provisions of the following Nuclear Incident Exclusion Clause—Liability—Reinsurance—No. 1B attached hereto. The word "Reassured" used therein means "Company".

4. Insurance or reinsurance loss portfolio transfers of any kind.

5. Coverage written specifically to insure or reinsure punitive damages.

6. All reinsurance assumed by the Company, except intra-Company pooling arrangements.

7. All loss, cost or expense directly or indirectly arising out of, resulting as a consequence of or related to War. "War", as utilized herein, shall mean war whether or not declared, civil war, martial law, insurrection, revolution, invasion, bombardment or any use of military force, usurped power or confiscation, nationalization or damage of property by any government, military or other authority. This exclusion shall apply whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss.

8. All loss, cost or expense directly or indirectly arising out of, resulting as a consequence of or related to Pollution, whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss. "Pollution" means any actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste. Waste includes materials to be recycled,

3

reconditioned or reclaimed. This exclusion shall not apply to the extent that such liabilities would be covered under the Company's Coverage Form, subject to this Agreement.

9. Aggregate Excess of Loss or Stop Loss Coverages.

10. Retroactive Coverage for known incidents.

11. Professional Liability or Errors and Omissions Coverage except for those professions where coverage is granted in the Company's Coverage Form.

12. Liability, including all loss, cost or expense, arising out of, resulting as a consequence of or related to security laws or regulations.

13. Any coverage written specially to apply to Environmental Impairment Liability Coverage.

14. Contractors all risk, engineers all risk, and wrap-up coverages.

15. Liability, including all loss, cost or expense, directly or indirectly arising out of, resulting as a consequence of, or related to:

> a. Asbestos;
> b. Silica;

Whether or not there is another cause of loss which may have contributed concurrently or in any sequence to a loss.

16. The Company's liability, including all loss, cost or expense, beyond circumscribed policy provisions, including but not limited to, punitive, exemplary, consequential or compensatory damages, resulting from a claim of an insured or an insured's assignee against the Company, its agents or employees.

17. All loss, cost or expense arising out of or related to, either directly or indirectly, any "Terrorist Activity," as defined herein, and any action taken to hinder, defend against or respond to any activity. This exclusion applies regardless of any other cause or event that in any way contributes concurrently or in any sequence to the loss, cost or expense.

   a. "Terrorist Activity" shall mean any deliberate, unlawful act that:

      (1) is declared by any authorized governmental official to be or to involve terrorism, terrorist activity or acts of terrorism; or

      (2) includes, involves or is associated with the use or threatened use of force, violence or harm against any person, tangible or intangible property, the environment, or any natural resource, whether the act or threatened act is intended, in whole or in part, to

         (a) promote, further or express opposition to any political, ideological, philosophical, racial, ethnic, social or religious cause or objective; or
         (b) influence, disrupt or interfere with any government related operations, activities or policies; or
         (c) intimidate, coerce or frighten the general public or any segment of the general public; or
         (d) disrupt or interfere with the national economy or any segment of the national economy

      (3) includes, involves, or is associated with, in whole or in part, any of the following activities, or the threat thereof:

4

(a)   hijacking or sabotage of any form of transportation or conveyance, including but not limited to spacecraft, satellite, aircraft, train, vessel, or motor vehicle;

(b)   hostage taking or kidnapping;

(c)   the use or threatened us of, or release or threatened release of any nuclear, biological, chemical or radioactive agent, material, device or weapon;

(d)   the use of any bomb, incendiary device, explosive or firearm;

(e)   the interference with or disruption of basic public or commercial services and systems, including but not limited to the following services or systems: electricity, natural gas, power, postal, communications, telecommunications, information, public transportation, water, fuel, sewer or waste disposal;

(f)   the injuring or assassination of any elected or appointed government official or any government employee;

(g)   the seizure, blockage, interference with, disruption of, or damage to any government buildings, institutions, functions, events, tangible or intangible property or other assets; or

(h)   the seizure, blockage, interference with, disruption of, or damage to tunnels, roads, streets, highways, or other places of public transportation or conveyance.

b.   Any activities listed in section a.(3). above shall be considered Terrorist Activity except where the Company can demonstrate to the Reinsurer that the foregoing activities or threats thereof were motivated solely by personal objectives of the perpetrator that are unrelated, in whole or in part, to any intention to:

(1)   promote, further or express opposition to any political, ideological, philosophical, racial, ethnic, social or religious cause or objective; or

(2)   influence, disrupt or interfere with any government related operations, activities or policies; or

(3)   intimidate, coerce or frighten the general public or any segment of the general public; or

(4)   disrupt or interfere with the national economy or any segment of the national economy

## ARTICLE VIII

**DEFINITION OF LOSS OCCURRENCE**

A.   The term "Loss Occurrence(s)" as used herein means each loss occurring or series of losses occurring, arising out of one event, provided that as respects:

1.   Products Liability (bodily injury and property damage), the term "Loss Occurrence" shall mean the sum of all damages arising from the consumption, use or exposure to the Member's product(s) occurring during the term of this Agreement, in respects to each Member, each Coverage Form, emanating from or traceable to the same causative agency.

2.   Third Party Bodily Injury or Property Damage Liability, other than Automobile and Products, arising or emanating from or traceable to a continuous or repeated exposure to the same causative agency, the term "Loss Occurrence" shall mean the sum of all damages sustained by each Member, each Coverage Form during the term of this Agreement.

B.   If the date of any loss occurring under the Company's Coverage Form cannot be specifically determined, the date of loss shall be the inception date of the Coverage Form; such Coverage Form period shall be deemed not to exceed 12 calendar months.

## ARTICLE IX

ULTIMATE NET LOSS

A. The term "Ultimate Net Loss" shall mean the sum or sums paid by the Company for which it is liable under the Coverage Form reinsured hereunder, including any Loss Adjustment Expenses, as hereinafter defined. All sums hereunder shall be subject to deductions for all inuring reinsurances or insurances whether collectible or not, and all reimbursements or recoveries and any subrogation or salvages received. The Reinsurer's liability hereunder shall not increase by reason of the inability of the Company to collect from any other Reinsurer or insurer, for any reason, any amount that may be due from such Reinsurer or insurer.

B. Except as specifically provided for or excluded under this Article, the term "Loss Adjustment Expense" shall mean all expenses which have been paid by the Company in the investigation, adjustment, settlement or defense of specific claims covered under the Coverage Forms and the Company reinsured hereunder, but not including office, administrative or overhead expenses of the Company or salaries and expenses of its officials and employees.

C. In the event of the insolvency of the Company, amounts reinsured hereunder shall be otherwise defined herein except such amounts shall be allowed on a basis in accordance with the INSOLVENCY Article.

D. In the event of verdict or judgment is reduced by an appeal or a settlement, subsequent to the entry of a judgment, resulting in an ultimate savings on such verdict or judgment, or a judgment is reversed outright, the expense incurred in securing such final reduction or reversal shall (1) be prorated between the Reinsurer and the Company in proportion that each benefits from such reduction or reversal and the expense incurred up to the time of the original verdict or judgment shall be prorated in proportion to each party's interest in such verdict or judgment; or (2) when the terms and conditions of the Company's policies reinsured hereunder include expenses as part of the policy limit, be added to the Company's Ultimate Net Loss.

## ARTICLE X

CLAIMS

A. The Company shall immediately provide written notice to the Reinsurer of all claims upon which reserve of fifty percent or more of the applicable retention there under has been posted by the Company and shall promptly advise the Reinsurer of any subsequent developments pertaining thereto.

B. In addition to the foregoing, the following categories of claims shall be reported in writing to the Reinsurer immediately regardless of the liability of the Company or coverage under the Coverage Form:

1. Fatalities;
2. Spinal cord injuries with paralysis;
3. Serious burns;
4. Brain injuries;
5. Amputation of a limb;
6. Sexual abuse or molestation claims involving more than one individual;

C. The Company has the obligation to investigate and, to the extent that may be required by the Coverage Form reinsured hereunder, defend any claim affecting this reinsurance and to pursue such claim to a conclusion.

D. It is understood that when so requesting in writing, the Company will afford the Reinsurer or its representatives an opportunity to be associated with the Company, at the expense of the Reinsurer, in the adjustment, settlement or defense of any Claim, suit or proceeding involving this reinsurance; and the Company and the Reinsurer shall cooperate in every respect in the adjustment, settlement or defense of such claim, suit or proceeding.

## ARTICLE XI

**SUBROGATION AND SALVAGE**

A.   The Reinsurer shall be subrogated, as respects any loss for which the Reinsurer shall actually pay or become liable, but only to the extent of the amount of payment by or the amount of liability to the Reinsurer, to all the rights of the Company against any person or other entity who may be legally responsible in damages for said loss.  The Company hereby agrees to enforce such rights, but in case the Company shall refuse or neglect to do so the Reinsurer is hereby authorized and empowered to bring any appropriate action in the name of the Company or its policyholders, or otherwise to enforce such rights.

B.   Any subrogation, salvage or other amounts recovered applying to risks covered under this Agreement shall always be used to reimburse the excess carriers (from the last to the first, beginning with the carrier of the last excess), according to their participation, before being used in any way to reimburse the Company for its primary loss.

C.   In the event there is any subrogation, salvage or other amounts recovered subsequent to a loss settlement, it is agreed that if the expenses incurred in obtaining such amounts are less than the amount recovered such expenses shall be borne by each party in the proportion that each party benefits from the amount recovered, otherwise, the amount recovered shall first be applied to the reimbursement of expense and recovery and the remaining expense shall be borne by the Company and by the Reinsurer in proportion to the liability of each party before such recovery has been obtained.  Expenses hereunder shall exclude all office, administrative and overhead expenses of the Company and all salaries and expenses of its officials and employees.

## ARTICLE XII

**ACCESS TO RECORDS**

The Company shall place at the disposal of the Reinsurer, and the Reinsurer shall have the right to inspect, through its authorized representatives, at all responsible times during the currency of this Agreement and thereafter the books, records and papers of the Company pertaining to the reinsurance provided hereunder.

## ARTICLE XIII

**TAXES**

The Company (or the intermediary where applicable) shall pay all taxes on premiums ceded to the Reinsurer under this Agreement, including any Federal Excise Tax but excluding income or other taxes imposed directly to the Reinsurer. Notwithstanding the above, where the Federal Excise Tax is applicable the Reinsurer agrees to the deduction of 1% of such premium to a fund payment of the tax.

In the event of any return premium becoming due hereunder, the Reinsurer shall deduct 1% from the amount of the return, and the Company (or the intermediary where applicable) is responsible for recovering the tax from the United States government.

## ARTICLE XIV

**INSOLVENCY**

In the event of the insolvency of the Company, this reinsurance shall be payable directly to the Company or to its liquidator, receiver, conservator or statutory successor immediately upon demand on the basis of the liability of the Company without diminution because of the insolvency of the Company or because the liquidator, receiver, conservator or statutory successor of the Company has failed to pay all or a proportion of any claim. It is agreed however that any liquidator, receiver, conservator, or statutory successor to the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company which would involve a possible liability on the part of the Reinsurer, indicating the policy or bond reinsured, within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership. It is further agreed that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the receiver shall be chargeable subject to the approval of the Court against the Company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

Where two or more Reinsurers are involved in the same claim and a majority in interest elect to interpose defense to such claim, the expense shall be apportioned in accordance with the Terms of this Agreement as though such expense had been incurred by the Company. The reinsurance shall be payable by the Reinsurer or to its liquidator, receiver, conservator, or statutory successor, except: (a) where this Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company; (b) where the Reinsurer with the consent of the direct insured or insureds has voluntarily assumed such original policy obligations of the Company as direct obligations of the Reinsurer to the payees under the Policy Reinsured and in substation of the obligations of the Company to the payees; or (c) where provided otherwise under applicable law. Then, with the prior approval of the applicable regulatory authority, if required, the Company is entirely released from its obligation and the Reinsurer shall pay any loss directly to the payees under the policy Reinsured.

## ARTICLE XV

**OFFSET**

Unless prohibited by applicable law, the Reinsurer or the Company may offset any balance, whether on account of premiums, commissions, claims, loss, expense, recoveries or any other amount, due from one party to the other under this Agreement or any other reinsurance agreement entered into between them.

## ARTICLE XVI

**PREMIUM, REPORTS AND REMITTANCES**

A. The Company shall pay to the Reinsurer a premium of $775,968 and is due and payable within 30 days from the effective date of this Agreement. The premium shall be adjusted at the rate of $2.965446 per 100 worker hours based on an estimate of 26,166,977 (hereinafter "exposure").

B. The Reinsurer will allow up to 10% margin increase in exposure changes during the term of this Agreement with no additional premium due. However, in the event the exposure under this Agreement is greater than 10% of the estimate, the Company shall pay to the Reinsurer additional premium based upon the increase of that portion of the exposure exceeding 10%.

C. It is agreed that the Company is not required to refer to the Reinsurer for excess pricing on addition of new Members.

8

D. Within 30 days after the termination of this Agreement, a final premium audit adjustment shall be made. As part of the final premium audit, the Company shall render to the Reinsurer a statement of the Company's updated exposures computed by the application of the rate stipulated above and any additional premium to the Reinsurer shall be provided with the statement.

E. Payment to the Reinsurer of its portion of allocated loss and expense paid by the Company will be made by the Reinsurer to the Company promptly after proof of coverage and payment by the Company hereunder is received by the Reinsurer.

## ARTICLE XVII

**NON-ASSIGNMENT / THIRD PARTY RIGHTS**

Except as provided in Article XV, in no event shall any person or entity other than the Company and the Reinsurer have any rights under this Agreement and said Agreement shall not be assignable by either party.

## ARTICLE XVIII

**ARBITRATION**

Any and all disputes or difference arising out of this Agreement, including its formation and validity, shall be submitted to binding arbitration. Any arbitration shall be based upon the Procedures for the Resolution of the U.S. Insurance and Reinsurance disputes dated September 1999 (the "Procedures"), as supplemented by the paragraphs below. The panel shall consist of three disinterested arbitrators, one to be appointed by the Petitioner, one to be appointed by the Respondent and the third to be appointed by the two party-appointed arbitrators. The third arbitrator shall serve as the umpire who shall be neutral. The arbitrators and the umpire shall be persons who are current or former officers or executive of an insurer or reinsurer. Within 30 days of the commencement of the arbitration proceeding, each party shall provide the other party with the identification of its party-appointed arbitrator, his or her address (including telephone, fax, and e-mail information), and provide a copy of the arbitrator's curriculum vitae. If either party fails to appoint an arbitrator within that 30 day period, the non-defaulting party will appoint an arbitrator to act as the party-appointed arbitrator for the defaulting party. The umpire shall be appointed by the two party-appointed arbitrators as soon as practical (but no later than 30 days) after the appointment of the second arbitrator. The party appointed arbitrators may consult, in confidence, with the party who appointed them concerning the appointment of the umpire. Where the two party-appointed arbitrators have failed to reach agreement on an umpire within the time specified above, each party shall propose to the other in writing, within 7 days thereafter, eight umpire candidates from the ARIAS U. S. Certified Arbitrators List in effect at the time of the commencement of the arbitration. The umpire will then be selected in accordance with paragraph 6.7 (b) – (e) of the Procedures (unless the parties agree otherwise, the ARIAS U. S. Umpire Questionnaire Form in effect at the time of the commencement of the arbitration shall be used.)

The arbitration shall take place in New York, New York.

Unless prohibited by law, the Supreme Court of the State and county of New York and of the United States District Court for the Southern District of New York shall have exclusive jurisdiction over any and all court proceedings that either party may initiate in connection with the arbitration, including proceedings to compel, stay, or enjoin arbitration or to confirm, vacate, modify or correct an Arbitration Award.

For purposes of this article, the terms "Arbitration Award," "Disinterested," "Notice of Arbitration," "Panel," "Party" (or "Parties"), "Petitioner," "Respondent," and "Response" shall have the meaning set forth in article 2 of the Procedures (Definitions).

In the event of any conflict between the Procedures and this Article, this Article and not the Procedures will control.

## ARTICLE XIX

**ENTIRE AGREEMENT**

    A.  This Agreement constitutes the entire Agreement between the parties with respect to the business covered by the Agreement, except for separate contracts expressly disclosed within the Agreement or in an exhibit incorporated by reference.

    B.  This Article shall not be construed to limit the admissibility of evidence regarding the formation, interpretation, purpose or intent of the reinsurance Agreement.

## ARTICLE XX

**INTERMEDIARY**

    A.  Marsh Risk & Insurance Services is hereby recognized as the Intermediary negotiating this Agreement for all business hereunder. All communications, including notices, premiums, return premiums, commissions, taxes, losses, loss adjustment expenses, salvages and loss settlements relating thereto shall be transmitted to the Reinsurer or the Company through Marsh Risk & Insurance Services, 1301 Fifth Avenue, Suite 1900, Seattle, Washington 98101. Payments by the Company to the Intermediary shall be deemed to constitute payment to the Reinsurer. Payments by the Reinsurer to the Intermediary shall be deemed only to constitute payment to the Company to the extent that such payments are actually received by the Company.

    B.  The Company reserves the right to change the Intermediary as described in paragraph A. above, by giving not less than ten (10) days notice in writing to the Reinsurer.

## ARTICLE XXI

**COMMENCEMENT AND TERMINATION**

    A.  This Agreement shall become effective as of 12:01 a.m. PST January 1, 2013 and shall terminate as of 12:01 PST January 1, 2014.

    B.  The Reinsurer shall be discharged and released from all liability as of the date of termination of this Agreement for any losses occurring subsequent to the date of termination of this Agreement.

    C.  In the event that this Agreement is canceled or terminated, the reinsurance provided herein shall terminate simultaneously, in which case the Company shall be entitled to a return premium on the Agreement, less any corresponding ceding commission, on a pro rata basis. The Company may cancel this Agreement, effective at any time during its term, by giving proper written notice (as provided in paragraph E. below) of not less than 90 days, in which case the Company shall be entitled to a return premium on the Agreement, less any corresponding ceding commission, on a pro rata basis.

    D.  In the event of non-payment of premium when due the Reinsurer may cancel this Agreement by giving prior written notice (as provided in E. below) not less than 30 days.

    E.  Notwithstanding any Article of this Agreement to the contrary, no notice of cancellation by the Reinsurer shall be effective unless sent directly to the Company at the address provided in the Declarations through an internationally recognized courier capable of providing written confirmation of delivery (e.g., Federal Express) at least 30 or 90 days (whichever is applicable) before the stated date of cancellation and received by the Company. Any cancellation for which notice is required shall be effective at midnight on the last day of the notice period.

F.   Notwithstanding the termination of this Agreement as hereinabove provided, the provisions of this Agreement shall continue to apply to all unfinished business hereunder to the end that all the obligations and liabilities incurred by each party hereunder prior to such termination shall be fully performed and discharged.

## ARTICLE XXII

**SEVERABILITY**

If any provisions of this Agreement shall be rendered illegal or unenforceable by the laws, regulations or public policy of any jurisdiction, such provisions shall be considered void in such jurisdiction, but this shall not effect the validity or enforceability of any other provisions of this Agreement or the validity or enforceability of such provision in other jurisdiction.

## ARTICLE XXIII

**GOVERNING LAW**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of law principles.

## ARTICLE XXIV

**CONFIDENTIALITY**

All terms of this Agreement, all materials provided by the Company to the Reinsurer in connection with this Agreement, and unless otherwise in the possession of the Reinsurer on a non-confidentiality basis, all information contained in such materials (collectively, "Confidential Information") shall be kept confidential by the Reinsurer, unless the disclosure is required pursuant to process of law, or the disclosure is to the Reinsurer's affiliates, retrocessionaires, legal counsel, financial auditors, or governing regulatory authorities.

If the Reinsurer is required to disclose any Confidential Information pursuant to process of law, it shall give prompt written notice to the Company so that the Company may seek a protective order or otherwise object to the disclosure.

Disclosure or use of Confidential Information for any purpose beyond the scope of this Agreement is expressly forbidden without the prior consent of the Company.  This Article shall survive the expiration or termination of this Agreement.

## ARTICLE XXV

**NOTICES**

Any written notice required under this Agreement shall be transmitted to the Company or the Reinsurer at the address listed on the Declarations.

This Agreement is entered into between sophisticated parties each of which has reviewed the Agreement and is fully knowledgeable about its Terms.  The parties therefore agree that this Agreement shall be construed without regard to the authorship of the language and without any presumption or rule of construction in favor of either of them.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed in duplicate this 11 day of February, 2013.

ACCEPTED:

Washington Cities Insurance Authority                    Ironshore Indemnity Inc.

_____ (Secretary)

_____ (President)

Attested by                                              Attested by



## IRONSHORE INDEMNITY, INC.

(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY 10008
(877) IRON411

**Endorsement # 1B**

Reinsurance Agreement No.: 000861003                     Effective Date of Endorsement: January 1, 2013
Reinsured Name: Washington Cities Insurance Authority

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## NUCLEAR LIABILITY EXCLUSION

This insurance does not apply to:

1.   any liability:

     a.   with respect to which the Reinsured is also a Reinsured under a nuclear energy liability policy issued by the Nuclear Energy Liability-Property Insurance Association, Mutual Atomic Energy Liability Underwriters or the Nuclear Insurance Association of Canada, or would be an Reinsured under any such policy but for its termination upon exhaustion of its limit of liability,

     b.   resulting from the hazardous properties of nuclear material and with respect to which (1) any person or any organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any amendment or revision thereto, or any similar law; (2) the Reinsured is, or had this policy not been available would be, entitled to indemnity from the United States of America or any agency thereof under any agreement entered into by the United States of America or an agency thereof with any person or organization;

     c.   for Bodily Injury or Property Damage resulting from the hazardous properties of nuclear material if:

          i)    the nuclear material (1) is at any nuclear facility owned by the Reinsured or operated by the Reinsured or on the Reinsured's behalf or (2) has been discharged or dispensed therefrom;

          ii)   the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by the Reinsured or on the Reinsured's behalf; or

          iii)  the Bodily Injury or Property Damage arises out of the furnishing by the Reinsured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to Property Damage to such nuclear facility and any property thereat.

2.   As used in this exclusion:

     a.   "hazardous properties" includes radioactive, toxic or explosive properties;

     b.   "nuclear material" means source material, special nuclear material or by-product material;

     c.   "source material," "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any amendment or revision thereto;

d.  "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

e.  "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of a nuclear facility included within the definition of nuclear facility below;

f.  "nuclear facility" means:

    i)  any nuclear reactor;

    ii)  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel or (3) handling, processing or packaging wastes;

    iii)  any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the Reinsured's custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 260 grams of uranium 235; or

    iv)  any structure, basin, excavation, premises or place prepared or used for storage or disposal of waste, and

        includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

g.  "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

h.  Property Damage includes all forms of radioactive contamination of property.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

**Authorized Representative**

February 11, 2013
Date

# Exhibit B

Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| FREDRICK and ANNALESA THOMAS; and JO-HANNA READ, as Guardian ad Litem of E.T., a minor,<br><br>    Plaintiffs,<br><br>  v.<br><br>JASON CANNON; BRIAN MARKERT; RYAN MICENKO; MICHAEL WILEY; MICHAEL ZARO; CITY OF FIFE; and CITY OF LAKEWOOD;<br>    Defendants.<br>─────────────────────────<br>FREDRICK THOMAS and ANNALESA THOMAS, as Co-Administrators of the Estate of Leonard Thomas, and its statutory beneficiaries,<br><br>    Plaintiffs,<br><br>  v.<br><br>BRIAN MARKERT; MICHAEL WILEY; NATHAN VANCE; MICHAEL ZARO; CITY OF FIFE; and CITY OF LAKEWOOD;,<br><br>    Defendants. | Nos. 3:15-05346 BJR<br>   3:16-cv-05392<br>CONSOLIDATED CASES<br><br>VERDICT |

**We the Jury answer the questions submitted by the Court as follows:**

1

## <u>Question One</u>

**Question 1:**  Plaintiffs E.T. and the Estate of Leonard Thomas bring a Fourth and Fourteenth Amendment constitutional claim for the unreasonable seizure of E.T. from Leonard Thomas.  Did any of the Defendants seize E.T. from his father Leonard Thomas in an unreasonable manner, or cause E.T. to be unreasonably seized?

Yes ✓  No____

**If you answered yes, go to Questions 1a and 1b.  If you answered no, go directly to Question 2.**

**Question 1a.**  Which Defendants committed or caused the seizure found in Question 1?

| | | |
|---|---|---|
| **Michael Zaro** | Yes ✓ | No ____ |
| **Michael Wiley** | Yes ✓ | No ____ |
| **Brian Markert** | Yes ✓ | No ____ |
| **City of Lakewood** | Yes ✓ | No ____ |

**Question 1b.**  Which Plaintiffs were damaged by the seizure found in Question 1?

| | | |
|---|---|---|
| **E.T.** | Yes ✓ | No ____ |
| **Estate of Leonard Thomas** | Yes ✓ | No ____ |

2

PAGE 30

## Question Two

**Question 2**:  Plaintiff the Estate of Leonard Thomas brings a Fourth Amendment constitutional claim for excessive force.  Did any of the Defendants use excessive force against Leonard Thomas, or cause excessive force to be used against him?

Yes  ✓  No____

**If you answered yes, go to Questions 2a.  If you answered no, go directly to Question 3.**

**Question 2a.**  Which Defendants caused the excessive force found in Question 2?

| | | |
|---|---|---|
| **Michael Zaro** | Yes ✓ | No ___ |
| **Michael Wiley** | Yes ✓ | No ___ |
| **Brian Markert** | Yes ✓ | No ___ |
| **City of Lakewood** | Yes ✓ | No ___ |

3

## <u>Question Three</u>

**Question 3**:  Plaintiffs E.T., Fred Thomas, and Annalesa Thomas bring a Fourteenth Amendment claim for deprivation of their familial relationship with Leonard Thomas.  Did Michael Zaro cause E.T., Fred Thomas, or Annalesa Thomas to be deprived of their familial relationship with Leonard Thomas by acting with deliberate indifference to the consequences of his (Zaro's) actions and decisions?

Yes __✓__        No____

**If you answered yes, go to Question 3a and 3b.  If you answered no, go directly to Question 4.**

**Question 3a:**  Is the City of Lakewood also responsible?

Yes __✓__        No ____

**Question 3b.**  Which of the plaintiffs were damaged by the deprivation found in Question 3?

| | | |
|---|---|---|
| **E.T.** | Yes __✓__ | No____ |
| **Fred Thomas** | Yes __✓__ | No____ |
| **Annalesa Thomas** | Yes __✓__ | No____ |

4

## Question Four

**Question 4:** Plaintiffs the Estate of Leonard Thomas, E.T., Fred Thomas, and Annalesa Thomas bring a Fourth Amendment constitutional claim for unreasonable seizure of their house through use of the explosive breach. Did any of the Defendants seize Plaintiffs' property through use of the explosive breach in an unreasonable manner, or cause their property to be unreasonably seized?

Yes ✓  No____

**If you answered yes, go to Questions 4a and 4b. If you answered no, go directly to Question 5.**

Question 4a. Which of the Defendants committed or caused the seizure?

| | | |
|---|---|---|
| **Michael Zaro** | Yes ✓ | No ____ |
| **Michael Wiley** | Yes ✓ | No ____ |
| **City of Lakewood** | Yes ✓ | No ____ |

Question 4b. Which of the Plaintiffs were damaged by the seizure found in Question 4?

| | | |
|---|---|---|
| **E.T.** | Yes ✓ | No____ |
| **Estate of Leonard Thomas** | Yes ✓ | No____ |
| **Annalesa Thomas** | Yes ✓ | No ____ |
| **Fred Thomas** | Yes ✓ | No ____ |

5

## Question Five

**Question 5**:  Plaintiffs the Estate of Leonard Thomas and E.T. bring a Fourth Amendment claim for unreasonable seizure of their dog. Did any of the Defendants unreasonably seize the dog when they killed him, or cause an unreasonable seizure of the dog?

Yes  ✓    No ____

**If you answered yes, go to Questions 5a and 5b.  If you answered no, go directly to Question 6.**

**Question 5a.**  Which Defendants committed or caused the seizure found in Question 5?

| | | |
|---|---|---|
| **Michael Wiley** | Yes ✓ | No ____ |
| **Nathan Vance** | Yes ____ | No ✓ |

**Question 5b.**  Which Plaintiffs were damaged by the seizure found in Question 5?

| | | |
|---|---|---|
| **E.T.** | Yes ____ | No ✓ |
| **Estate of Leonard Thomas** | Yes ✓ | No ____ |

6

## Question Six

**Question 6**: Plaintiff Fred Thomas brings a Fourth Amendment constitutional claim for unreasonable seizure of his person.  Did any of the Defendants seize Fred Thomas, or cause his person to be seized, without legal cause or with excessive force?

Yes ✓  No ____

**If you answered yes, go to Questions 6a.  If you answered no, go directly to Question 7.**

**Question 6a.**  Which of the Defendants committed or caused seizure found in Question 6?

| | | |
|---|---|---|
| **Michael Zaro** | Yes ✓ | No ____ |
| **Ryan Micenko** | Yes ____ | No ✓ |
| **Jason Cannon** | Yes ✓ | No ____ |

7

PAGE 35

## Question Seven

**Question 7**:  Plaintiff Fred Thomas brings a claim under Washington state law for false arrest. Did the Cities of either Fife or Lakewood, through the actions of their employees, cause Fred Thomas to be falsely arrested on May 24, 2013?

Yes √  No____

**If you answered yes, go to Questions 7a.  If you answered no, go directly to Question 8.**

**Question 7a.**  Which Defendant(s), through the actions of their employees, committed or caused the false arrest of Fred Thomas?

**The City of Lakewood**          Yes √          No ____
**The City of Fife**                    Yes ____          No √

8

## Question Eight

**Question 8**:  Plaintiffs E.T. and Annalesa Thomas bring a claim under Washington state law for outrage against the City of Lakewood. Did the City of Lakewood, through the actions of its employees, intentionally or recklessly cause severe emotional distress to E.T. or Annalesa Thomas by outrageous conduct on May 24, 2013?

Yes __✓__ No____

**If you answered yes, go to Question 8a.  If you answered no, go directly to Question 9.**

**Question 8a.**  Which of the Plaintiffs suffered severe emotional distress caused by the outrageous conduct of these Defendants?

| | | |
|---|---|---|
| **E.T.** | Yes __✓__ | No____ |
| **Annalesa Thomas** | Yes __✓__ | No____ |

9

## **Question Nine**

**Question 9:** Plaintiff E.T. brings a claim against the Cities of Fife and Lakewood under Washington state law for negligence in the investigation which separated him from his father. Did a negligent investigation by employees of the Cities of Fife or Lakewood cause the wrongful permanent removal of E.T. from his father Leonard Thomas?

Yes __✓__      No____

**If you answered yes, go to Questions 9a.  If you answered no, go directly to Question 10.**

**Question 9a.**  Which Defendants are responsible for the negligence you found in Question 9?

| | | |
|---|---|---|
| **The City of Lakewood** | Yes __✓__ | No ____ |
| **The City of Fife** | Yes __✓__ | No ____ |

10

PAGE 38

## **Question Ten**

**Question 10:** If you found in favor of any of the Plaintiffs on any claim, please answer the questions below for those Plaintiffs you found in favor of. Otherwise, please sign and return your verdict form. Take care to only award damages for claims on which you found liability.

**10a. E.T.:** For the claims you found in favor of E.T., what damages do you find for E.T. for each claim?

- Unreasonable seizure from his father (Question 1): $ 500,000.00
- Deprivation of his familial relationship with Leonard (Question 3): $ 2,750,000.00
- Unreasonable seizure of his house (Question 4): $ ~~WWW~~ 125,000.00
- Unreasonable seizure of his dog (Question 5): $ N|A
- Outrage (Question 8): $ 125,000.00
- Negligent Investigation (Question 9): $ 500,000.00

**10b. Estate of Leonard Thomas:** For the claims you found in favor of the Estate of Leonard Thomas, what damages do you find for the Estate of Leonard Thomas for each claim?

- Unreasonable seizure of his son (Question 1): $ 750,000.00
- Excessive Force (Question 2): $ 1,000,000.00
- Unreasonable seizure of his house (Question 4): $ 125,000.00
- Unreasonable seizure of his dog (Question 5): $ 10,000.00

**10c. Annalesa Thomas:** For the claims you found in favor of Annalesa Thomas, what damages do you find for Annalesa Thomas for each claim?

- Deprivation of her familial relationship with Leonard (Question 3): $ 750,000.00
- Unreasonable seizure of her house (Question 4): $ 500,000.00
- Outrage (Question 8): $ 125,000.00

11

PAGE 39

**10d. Fredrick Thomas:** For the claims you found in favor of Fredrick Thomas, what damages do you find for Fredrick Thomas for each claim?

- Deprivation of his familial relationship with Leonard (Question 3): $ 750,000.00
- Unreasonable seizure of his house (Question 4):    $ 125,000.00
- Excessive force (Question 6):    $ 0.00
- False arrest (Question 7):    $ 500,000.00

12

## Question Eleven

**Question 11:**  Should punitive damages be assessed against any of the following
Defendants? Answer only as to Defendants who you have found individually liable on one or
more of Plaintiffs' constitutional claims (Questions 1–5).

**Michael Zaro**                         Yes ✓          No___
    If yes, state the amount of punitive damages: $ 3,000,000.00

**Michael Wiley**                        Yes ✓          No___
    If yes, state the amount of punitive damages: $ 1,500,000.00

**Brian Markert**                        Yes ✓          No___
    If yes, state the amount of punitive damages: $ ~~1,750,000.00~~ cml
                                             $ 2,000,000.00

13

## **Question Twelve**

**Question 12**:  Should punitive damages be assessed against any of the following Defendants? Answer only as to Defendants who you have found individually liable on Question 6.

**Jason Cannon**          Yes ___      No ✓

     If yes, state the amount of punitive damages:  $_____N/A_____

**Ryan Micenko**          Yes ___      No ✓

     If yes, state the amount of punitive damages:  $_____N/A_____

Date and sign the form and advise the Court that you have reached a verdict.

DATED this ___14th___ day of July, 2017.

_____
Presiding Juror

14

PAGE 42

# Exhibit C

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

FREDRICK and ANNALESA THOMAS; and
JO-HANNA READ, as Guardian ad Litem of
E.T., a minor,

                Plaintiffs,

          v.

JASON CANNON; BRIAN MARKERT;
RYAN MICENKO; MICHAEL WILEY;
MICHAEL ZARO; CITY OF FIFE; CITY OF
LAKEWOOD; and PIERCE COUNTY
METRO SWAT TEAM,

                Defendants.

_____

FREDRICK THOMAS and ANNALESA
THOMAS, as Co-Administrators of the Estate
of Leonard Thomas, and its statutory
beneficiaries,

                Plaintiffs,

          v.

BRIAN MARKERT; MICHAEL WILEY;
NATHAN VANCE; MICHAEL ZARO;
SCOTT GREEN; JEFF RACKLEY; CITY OF
FIFE; CITY OF LAKEWOOD; PIERCE
COUNTY METRO SWAT TEAM; and JOHN
DOES 1 through 10,

                Defendants.

Nos. 3:15-05346 BJR
     3:16-cv-05392
CONSOLIDATED CASES

ORDER AMENDING
JUDGMENT

1

1       This matter having come before this Court upon Plaintiffs' Motion to Amend Judgment,

2   the Court having reviewed the records and files herein, including the jury's verdict (Dkt. 237),

3   the Court's original judgment (Dkt. 241), the plaintiff's motion to amend the judgment, and any

4   response by the defendants, and being fully advised; now therefore it is hereby

5       ORDERED that

6       Based on the Jury's responses on the verdict form (Dkt. No. 237), judgment is entered as

7   follows:

8       (1) in favor of plaintiff E.T. in the amount of $500,000 against defendants Michael Zaro,

9   Michael Wiley, Brian Markert, and the City of Lakewood, jointly and severally;

10      (2) in favor of plaintiff E.T. in the amount of $2,750,000 against defendants Michael Zaro

11  and the City of Lakewood, jointly and severally;

12      (3) in favor of plaintiff E.T. in the amount of $125,000 against defendants Michael Zaro,

13  Michael Wiley, and the City of Lakewood, jointly and severally;

14      (4) in favor of plaintiff E.T. in the amount of $125,000 against defendant the City of

15  Lakewood;

16      (5) in favor of plaintiff E.T. in the amount of $500,000 against defendants the City of

17  Lakewood and the City of Fife, jointly and severally;

18      (6) in favor of plaintiff the Estate of Leonard Thomas in the amount of $1,750,000

19  against defendants Michael Zaro, Michael Wiley, Brian Markert, and the City of Lakewood,

20  jointly and severally;

21      (7) in favor of plaintiff the Estate of Leonard Thomas in the amount of $125,000 against

22  defendants Michael Zaro, Michael Wiley, and the City of Lakewood, jointly and severally;

23      (8) in favor of plaintiff the Estate of Leonard Thomas in the amount of $10,000 against

24  defendant Michael Wiley;

25      (9) in favor of plaintiff Annalesa Thomas in the amount of $750,000 against defendants

26  Michael Zaro and the City of Lakewood, jointly and severally;

27

(Proposed) ORDER AMENDING JUDGMENT - 2
Nos. 3:15-05346/3:16-cv-05392 BJR
10633.1 kh086004

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1     (10) in favor of plaintiff Annalesa Thomas in the amount of $500,000 against defendants

2 Michael Zaro, Michael Wiley, and the City of Lakewood, jointly and severally;

3     (11) in favor of plaintiff Annalesa Thomas in the amount of $125,000 against defendant

4 the City of Lakewood;

5     (12) in favor of plaintiff Fred Thomas in the amount of $750,000 against defendants

6 Michael Zaro and the City of Lakewood, jointly and severally;

7     (13) in favor of plaintiff Fred Thomas in the amount of $125,000 against defendants

8 Michael Zaro, Michael Wiley, and the City of Lakewood, jointly and severally;

9     (14) in favor of plaintiff Fred Thomas in the amount of $500,000 against the City of

10 Lakewood;

11     (15) in favor of defendant Nathan Vance; and

12     (16) in favor of defendant Ryan Micenko.

13     In addition, the following punitive damages are assessed in favor of all plaintiffs, jointly,

14 against: (1) Defendant Michael Zaro in the amount of $3,000,000; (2) Defendant Michael Wiley

15 in the amount of $1,500,000; and (3) Defendant Brian Markert in the amount of $2,000,000.

16

17 DATED this 12th day of January, 2017.

18

19             Honorable Barbara J. Rothstein

20             United States District Court Judge

21 Presented by:

22 MacDONALD HOAGUE & BAYLESS

23

24 By __/s/ Tiffany Cartwright_____
    Timothy K. Ford, WSBA #5986

25     David J. Whedbee, WSBA #35977
    Tiffany M. Cartwright, WSBA #43564

26     Attorneys for Plaintiffs

27

(Proposed) ORDER AMENDING JUDGMENT - 3

Nos. 3:15-05346/3:16-cv-05392 BJR

10633.1 kh086004